UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MAKEYTA JONES, on behalf of M.B., a minor | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Case No. 4:04CV01504 RWS/AGF |
| JO ANNE B. BARNHART, Commissioner of Social Security, | ) ) ) | |
| Defendant. | ) ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before the Court for judicial review of the final decision of the Commissioner of Social Security denying the application for supplemental security income (SSI) filed by Makeyta Jones on behalf of her minor son, M.B., under Title XVI of the Social Security Act, 42 U.S.C. § 1382c. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed, and that the case be remanded to the Commissioner for further consideration.

Plaintiff (M.B.) was born on December 22, 1993. On November 14, 2002, Ms. Jones applied for SSI benefits, claiming that Plaintiff was disabled due to hyperactivity, behavioral problems, and stuttering. The application was denied at the initial administrative level, and Plaintiff requested a hearing before an administrative law judge (ALJ). A hearing was held on April 12, 2004, at which Plaintiff and Ms. Jones testified.

On June 21, 2004, the ALJ issued a decision that Plaintiff was not disabled as defined by the Social Security Act. Plaintiff appealed to the Appeals Council of the Social Security Administration, which denied her request for review. Plaintiff has thus exhausted all administrative remedies, and the ALJ's decision stands as the final agency action. Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ erred in finding that Plaintiff had less than marked limitation in attending and completing tasks and in interacting and relating to others.

## BACKGROUND

**Administrative, School, and Medical Records**

On June 13, 2001, Ms. Jones took Plaintiff to Hopewell Center upon referral by a school counselor. Plaintiff was seven years old at the time and in first grade. The intake screening form stated that Plaintiff's presenting problems, as reported by his mother, were "oppositional defiant behaviors," noting that he cut the wings off birds, would not follow directions by adults, was cruel to children, liked to destroy things when angry, lied, and stole. Ms. Jones reported that Plaintiff's behavior had been like that since September or October 2000. His relationship with his six siblings was reported as bad. Ms. Jones reported that Plaintiff's father had been using crack cocaine when Plaintiff was conceived, was a violent man, and was currently in jail. According to Ms. Jones, although Plaintiff's grades in school were good, he had few friends there and was often in trouble, including being suspended for pulling a girl's dress. Plaintiff was noted to be, from a physical standpoint, healthy and developmentally normal. Tr. at 162-66.

2

Plaintiff began treatment at Hopewell Center. A psychiatric evaluation dated August 7, 2001, completed by Saber A. Girgis, M.D., gave an Axis I diagnosis of ADHD (attention deficit/hyperactivity disorder) and an Axis V -- or Global Assessment of Functioning (GAF) -- score of 40, indicating major problems.[1] Dr. Girgis prescribed Tenex, Clonidine, and Risperdal, and opined that Plaintiff's prognosis was guarded. Tr. at 157-60.

Progress notes dated October 18, 2001, state that Plaintiff's behavior at school was better, and that he was following directions better. Tr. at 155. In January 2002 Ritalin was prescribed, and in March 2002 the prescription was renewed. Tr. at 152-53. Progress notes dated April 30, 2002 state that Plaintiff was not doing well, and that his behavior was "starting to get bad again," as reported by Ms. Jones. Tr. at 153. At his annual Hopewell Center assessment on May 23, 2002 (revised 3/02), Plaintiff was again diagnosed with ADHD (314.01 in the DSM-IV-TR). His current GAF score was noted as

---

[1] The "multiaxial assessment" system set forth in the Diagnostic & Statistical Manual of Mental Disorders (4th ed., Text Revision 2000) (DSM-IV-TR) assesses mental disorders on different axes, each of which refers to a different domain of information. There are five axes: Axis I refers to the individual's clinical disorders, other than personality disorders and mental retardation, which are covered in Axis II; Axis III refers to the individual's general medical condition; Axis IV refers to psycho-social and environmental problems; and Axis V represents the individual's GAF -- a score from 1 to 100 indicating the individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.

GAF scores of 31-40 indicate "major" impairments in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairments in these areas; scores of 51-60 indicate "moderate" difficulties; scores of 61-70 indicate "mild" difficulties; scores of 71-80 indicate "slight" difficulties.

35, with a high score that year of 40, and his current medications were listed as Tenex, Clonidine, and Risperdal. Tr. at 149-50.

The record includes progress notes from Murphy Health Center from October 28, 2002 through February 10, 2003. The notes from October 28, 2002 report that Plaintiff had had problems with depression and anxiety in the past. Tr. at 173. On November 5, 2002, Plaintiff was started on Methylin (a brand name for Ritalin). Tr. at 170. On November 20, 2002, continuing problems with ADHD, including disruptive behavior at school, were reported, and Plaintiff's dosage of Methylin was increased. Tr. at 169. Meanwhile, Plaintiff's third grade report card for the first quarter of the 2002-03 school year showed grades of C and D, with one B (reading). "Satisfactory progress" was noted with regard to social skills, such as cooperating with others in work and play, and with regard to most work habits that were listed, including completing assignments on time and organizing and taking care of materials. Tr. at 195.

On December 2, 2002, Plaintiff's teacher, Jana Schultz, completed a teacher's questionnaire for the state agency for disability determinations. The questionnaire asks the teacher's opinion of the student's functioning in six domains: (1) acquiring and using knowledge, (2) attending and completing tasks, (3) interacting and relating to others, (4) moving about and manipulating objects, (5) self-care, and (6) health and physical well-being. Ms. Schultz indicated in check-box form that Plaintiff had only slight problems in most areas of acquiring and using information. Tr. at 182.

She opined that Plaintiff had the following levels of problems in the 13 listed areas of attending and completing tasks: no problem with sustaining attention during

4

play/sports activities, carrying out single-step instructions, and waiting to take turns; a slight problem in paying attention when spoken to directly, focusing long enough to finish assigned activity or task, refocusing to task when necessary, and carrying out multi-step instructions; an obvious problem in changing from one activity to another without being disruptive, and organizing own things or school materials; a serious problem in completing work accurately without careless mistakes, working without distracting self or others, and working at reasonable pace/finishing on time; and a very serious problem with completing class/homework assignments. Tr. at 183.

In the domain of interacting and relating to others, Ms. Schultz opined that Plaintiff had no problem in expressing anger appropriately and asking permission appropriately; had a slight problem in relating experiences and telling stories, using language appropriate to the situation and listener, taking turns in a conversation, and interpreting meaning of facial expression/body language/hints/sarcasm; and a very serious problem in playing cooperatively with other children, making and keeping friends, and respecting/obeying adults in authority. Ms. Schultz indicated that Plaintiff had no problems in the other three domains, adding in narrative form that when Plaintiff was consistently on medication, there was a significant change in his behavior; he did not bother others, he put forth more effort, he talked less, and he seemed happier. Tr. at 184-87.

On November 11, 2002 and December 6, 2002, Ms. Jones completed a Function Report and a Daily Activities Report, respectively, about Plaintiff. She reported that Plaintiff had defiant behavior toward her and his teacher, did not have friends because of

behavior problems, had to be reminded "of everything he's supposed to do," made things up, started fights with his siblings, had trouble reading, stuttered, and did not listen to adults. Ms. Jones also mentioned self-abusive behavior by Plaintiff when "he was being corrected at home." She reported that Plaintiff's behavior was much better when he was on his medication, but that it made him glassy-eyed and gave him headaches. Tr. 59-67, 70-73.

Plaintiff's aunt completed a Daily Activities Questionnaire about him, also on December 6, 2002. She indicated that she had known Plaintiff from birth and saw him three times a week. She noted that he had trouble with authority, being still, getting along with children, and learning. She stated that Plaintiff did not listen and needed to be told things over and over again, did not complete tasks he was asked to do, and would go and hide for long periods of time. She further stated that she had observed Plaintiff hitting, biting, kicking, and fighting with other children. Tr. at 69.

On December 17, 2002, James Lane, Ph.D., a non-treating, non-examining state agency psychologist, completed a Childhood Disability Evaluation Form for Plaintiff. Dr. Lane found that Plaintiff's combination of impairments was severe, but did not meet, medically equal, or functionally equal the Commissioner's listings for childhood disabilities. More specifically, he opined in check-box form, that Plaintiff had no limitation in four of the six functional domains -- acquiring and using information, moving about and manipulating objects, caring for self, and health and physical well-being; and less than marked limitations in the two remaining domains -- attending and completing tasks, and interacting and relating with others. Dr. Lane's handwritten

comments further detailing his findings are largely illegible. Tr. at 189-94.

Progress notes from Murphy Health Center dated February 10, 2003, mentioned self-mutilation when Plaintiff got angry. Tr. at 198.

On February 12, 2003, due to his poor academic progress, Plaintiff was referred to Special School District of St. Louis County (SSD) for a comprehensive evaluation, including classroom observation, review of daily work, test scores, and teacher interview. Tr. at 93. Plaintiff's composite IQ score of 96 on a test conducted on March 19, 2003, showed that he was in the normal range (89-110), and overall results of a comprehensive cognitive assessment fell within the average ability classification, with Plaintiff performing as well or better than 40% of children his age. Tr. at 96-97.

The summary of the evaluation noted as follows:

> This student's test-taking behaviors were positive in terms of general effort and cooperation. [Plaintiff] was pleasant and responsive, and never disrespectful. However, he evidenced a high activity level and significant impulsivity. In his eagerness to begin handling materials, he often failed to hear full directions. . . . It was difficult for him to sustain effort and attention as he was always asking about what would come next. Examiners found it best to keep the immediate area clear of any unneeded materials that could distract. [Plaintiff] benefitted from other examiner-imposed structure in the form of prompts or cautions to check all choices, listen carefully, think before responding, etc.

Tr. at 97.

The summary stated that the diagnosis of ADHD, for which Plaintiff was then taking Concerta, was substantiated by the evaluation. Specifically, the summary noted that Plaintiff had difficulty in, among other things, sustaining effort to problem solve, following through on instructions, working independently, listening effectively,

7

transitioning between activities, and organizing himself and allocating time. SSD concluded that the impact of these problems was apparent in both the academic and social realms, and diagnosed Plaintiff as educationally health impaired, in need of special education and related services. Tr. at 97-98.

Accordingly, on March 31, 2003, an Individualized Educational Program (IEP) was prepared for Plaintiff. It stated that Plaintiff exhibited inattentive, hyperactive, and impulsive behaviors which significantly affected task focus, task completion, and organizational skills, which in turn affected his progress in school. The IEP listed the following to be among Plaintiff's strengths: good relationships with authority figures, polite, and well mannered. The Functional Assessment portion of the IEP noted that when Plaintiff did not take his medication or when there was a change in his environment, he would yell obscenities and throw things. Pursuant to the IEP, Plaintiff was to receive 300 hours per week of special education services for one year, in the form of instruction in task focus and completion and organizational skills. Tr. at 76-91.

The record includes a student discipline summary report for Plaintiff for the period of October 2002 through April 2003, listing numerous offenses from disrupting class to using obscenities to kicking and threatening other students. Tr. at 126-27. On May 20, 2003, Plaintiff saw Clifton Smith, D.O., who diagnosed ADHD, oppositional defiant disorder (313.81 in DSM-IV-TR), expressive language disorder (315-31[2] in DSM-IV-TR), and a GAF score of 45-50. Dr. Smith's Axis IV (psycho-social and environmental

---

[2] The clinician appears to have written 305.31 in error.

problems) diagnosis noted severe academic struggles and severe parent/child conflict. Dr. Smith recommended that Plaintiff continue on Concerta, 36 mg. daily. Tr. at 210-12.

Plaintiff's second-quarter fourth grade report card (2003-04 school year) showed improvement in his grades from the first quarter, going, for example, from F to D in spelling, D to B in math, and D to C+ in reading. Some improvement was also indicated in work habits and social skills, with "satisfactory progress" noted in most areas. "More progress needed" was noted for organizing and taking care of materials. The teacher's written comments stated that Plaintiff "has been progressing nicely," and that when he focused on the lesson, he did "a fine job." Tr. at 103. However, a Current Grade Report dated February 27, 2004, showed a C- in math, and a D in science and spelling (noting two Fs on spelling tests), and the teacher's comment that Plaintiff needed to work on being more organized. Tr. at 110. And a March 18, 2004 letter from the school principal informed Ms. Jones that Plaintiff had been suspended from school for five days for throwing a brick at another student, hitting the student's leg and causing an abrasion. Tr. at 109.

An annual IEP review meeting was held on April 8, 2004. The IEP goals reporting form noted several dates on which Plaintiff had made "sufficient progress" in meeting his goals of completing classroom work with reasonable accuracy, staying on task, and being organized. Ms. Jones indicated that she disagreed with the reported results. The report also noted increased cooperation in small group settings and improvement in identifying materials needed for class. It was believed, however, that Plaintiff continued to require special education services to address needs for social skills, organizational skills, task

9

focus, and assignment completion. The report stated that when Plaintiff consistently took his medications, he exhibited appropriate behavior with both peers and adults, but that Plaintiff continued to need direct instruction on these issues. Tr. at 134-43.

The record also contains a letter dated that same day, April 8, 2004, from Ms. Jones to SSD, complaining that services set forth in Plaintiff's IEP were not being provided. She wrote that when she talked to Plaintiff's classroom and SSD teachers about this, they told her that they thought Plaintiff could improve his organization and behavior on his own, but that he refused to do so. Ms. Jones wrote that with SSD's initial intervention, Plaintiff "began to have an instant level of success," but that his classroom teacher did not pay proper attention to him, resulting in his inconsistent and poor academic performance. Ms. Jones wrote that she believed Plaintiff's report card showing academic progress and satisfactory work habits and social skills was inaccurate; that Plaintiff continued to have problems getting along with his peers, obeying adults, and staying on task; and that he continued to need assistance in these areas. Tr. at 104-08.

**Evidentiary Hearing**

The evidentiary hearing was held on April 8, 2004, the same day as the annual IEP meeting and Ms. Jones's letter mentioned above. At the time of the hearing, Plaintiff was taking Concerta (36 mg. daily) for his ADHD and children's Tylenol for headaches. Tr. at 129-30. Plaintiff testified that he was eight years old[3] and in fourth grade. He said that he was doing "bad" at school, that school was boring, and that he did not have any

---

[3] In fact, Plaintiff was 10 years old at the time.

friends because he "bothers people" and so they did not want to be his friends. The ALJ asked Plaintiff whether he could stop bothering people and Plaintiff responded, "Yeah." The ALJ then pointed out some poor grades Plaintiff had gotten and asked him why he could not do better. Plaintiff responded that it was because his teacher did not help him. Plaintiff testified that he sometimes fought with children at school, but that these children started the fights. Tr. at 222-28.

Ms. Jones testified that Plaintiff's grades were poor because he had behavior problems and trouble focusing and organizing his school work. She testified that Plaintiff was continually getting into trouble in school and not receiving the help he needed. Ms. Jones testified that Plaintiff had been on Concerta for his ADD for about two years, and that the medication calmed him down but at the same time decreased his focus. She further stated that Plaintiff played too rough with other children, trying to hurt them, and as a result had no friends. Ms. Jones testified regarding Plaintiff's March 2004 five-day suspension from school for hitting another child with a brick, adding that Plaintiff had continual and continuing behavior problems in school. Tr. at 229-32.

**ALJ's Decision**

The ALJ first determined that Plaintiff had severe impairments within the meaning of 20 C.F.R. § 416.924(c), because he had more than slight abnormalities and more than minimal functional limitations.[4] The ALJ next concluded that Plaintiff's impairments did

---

[4] The ALJ's decision contains two conceded typographical errors. On the second page of the decision it states, "The child has xxxx, which is severe"; and in the summary of findings, it states that the ALJ found that Plaintiff had no severe impairment.

not meet or medically equal an impairment listed in Part B of Appendix I to Subpart P of 20 C.F.R. § 416.924(d)(1), and proceeded to determine whether they were "functionally equal" to a listed impairment, in that they resulted in extreme limitations in one of the six domains noted above, or marked limitations in two of these domains. The ALJ found that Plaintiff had less than marked limitations in acquiring and using knowledge, attending and completing tasks, and interacting and relating to others; and that he had no limitations in the remaining three domains -- moving about and manipulating objects, self-care, and health and physical well-being.

In concluding that Plaintiff had less than marked limitations in attending and completing tasks, the only evidence relied upon by the ALJ was Ms. Schultz's December 2, 2002 teacher questionnaire. The ALJ cited Ms. Schultz's observations that Plaintiff had no problem in sustaining attention during play/sports activities, carrying out single-step instructions, and waiting to take turns. The ALJ also pointed to Ms. Schultz's opinion that Plaintiff had only a slight problem in paying attention when spoken to directly, focusing long enough to finish assigned activity or task, and in carrying out multi-step instructions. Tr. at 14.

In concluding that Plaintiff had less than marked limitations in interacting and relating to others, the ALJ also relied only upon Ms. Schultz's questionnaire, this time referring to her indication that Plaintiff had no problem in expressing anger and in asking permission appropriately; and had only a slight problem in relating experiences and telling stories, using language appropriate to the situation and listener, taking turns in a

12

conversation, and in interpreting meaning of facial expression, body language, hints, and sarcasm. Tr. at 15.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). "'The court's review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision;'" the court "'must also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)). If after reviewing the record, the court finds that it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the court must affirm the Commissioner's decision. Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001).

Social security disability benefits are designed for disabled workers, but low-income parents may obtain SSI benefits on behalf of their disabled children as well. 42

13

U.S.C. § 1382c(a)(3)(C)(I). In order to be entitled to such benefits, a child under the age of 18 must show that he or she has a medically determinable physical or mental impairment resulting in "marked and severe functional limitations," which can be expected to result in death or which have lasted or can be expected to last for a continuous period of not less than 12 months. Id.

The Commissioner's regulations set out a three-step sequential evaluation process to determine whether a child's impairment (or combination of impairments) results in marked and severe functional limitations. The Commissioner begins by deciding whether the child is engaged in substantial gainful activity. If so, benefits are denied. If not, at step two, the child's impairment is evaluated to determine whether it is severe. If the child's impairment is not severe, there is no disability. If the impairment is severe, at step three the ALJ compares the impairment to the childhood listings in 20 C.F.R., Part 404, Subpart P, Appendix 1 (Appendix I). If the child's impairment meets, medically equals, or functionally equals a listed impairment, the child is disabled. 20 C.F.R. § 416.924(d).

A child's impairment is functionally equivalent to a listed impairment if there is an "extreme" limitation in one of the six functional domains noted above, or a "marked" limitation in at least two of the domains. Id. § 416.926a(b)(1); Hudson ex. rel Jones v. Barnhart, 345 F.3d 661, 665 (8th Cir. 2003); Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 80-85 (2d Cir. 2003). A marked limitation is one that "interferes seriously" with the child's ability to independently initiate, sustain, or complete domain-related activities; an extreme limitation is one that "interferes very seriously" with these abilities. Id. § 416.926a(e)(2), (3).

## ALJ's Determination that Plaintiff Did Not Have Marked Limitation in Two Domains

Plaintiff argues that the ALJ's decision that Plaintiff did not have marked limitations in attending and completing tasks, and in interacting and relating to others, is not based upon substantial evidence. More specifically, Plaintiff argues that the ALJ improperly relied upon Ms. Schultz's December 2, 2002 observations that Plaintiff had less than marked limitations in some activities encompassed by these domains, while simply ignoring Ms. Schultz's observations that in other relevant activities Plaintiff had a serious problem, and even a very serious problem in an activity in the domain of attending and completing tasks.

The Commissioner argues that the ALJ's decision that Plaintiff's limitations were less than marked in each of the two relevant domains is supported by substantial evidence. The Commissioner points to the parts of Ms. Schultz's questionnaire relied upon by the ALJ. The Commissioner also points to Plaintiff's report cards referenced above indicating satisfactory progress in work habits and social skills; the comment in the SSD evaluation summary that Plaintiff was cooperative during the March 19, 2003 testing; and the notation in the March 31, 2003 IEP that Plaintiff's strengths included good relationships with authority figures and being polite and well mannered. The Commissioner further notes that testing revealed no real cognitive weaknesses.

The Commissioner also argues that the references in the record to the fact that when Plaintiff was on his medications, there was a significant improvement in his behavior, support the ALJ's decision, because an impairment which can be controlled by

medication is not considered disabling.

Under the Commissioner's regulations, the domain of attending and completing tasks considers how well a child is able to focus and maintain attention; and to begin, carry through, and finish activities, including pace of performance and ease of changing activities. 20 C.F.R. § 416.929a(h). This regulation explains that school age children (ages 6-12) should be able to focus attention in a variety of situations in order to follow directions, remember and organize school work, and complete classroom and homework assignments; concentrate on details and not make careless mistakes in work (beyond that expected in other children of the same age who do not have impairments); change activities and routines without distracting themselves or others; stay on task and in place when appropriate; sustain attention long enough to participate in group sports; read on their own; complete family chores; and complete a transition task (e.g., change classrooms) without extra reminders and accommodations. Id. § 416.929(a)(h)(2)(iv).

The domain of interacting and relating with others considers how well a child initiates and sustains emotional connections with others, develops and uses the language of his or her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. Id. § 416.929a(I). School age children (ages 6-12) should be able to develop more lasting friendships with children their own age; begin to understand how to work in groups to create projects and solve problems; have an increasing ability to understand another's point of view and to tolerate differences; and be able to share ideas, tell stories, and speak in a manner that both familiar and unfamiliar listeners readily understand. Id. § 416.929a(i)(2)(iv).

16

Here, the Court finds the ALJ's decision lacking in several significant ways. The ALJ did not explain the weight to be accorded to the GAF score of 45-50 assessed on May 20, 2003, by Dr. Smith, a treating physician. As noted above, this score indicates serious impairment in school or social functioning. The ALJ's decision also failed to take into account Plaintiff's school disciplinary record. As late as March 2004, Plaintiff was reported to have thrown a brick at another child.

Nor did the ALJ explain why he did not credit Ms. Jones's testimony, which if believed, would appear to establish continued marked limitation in the two relevant domains. To be sure, there are statements one could glean from the record, such as those of Ms. Schultz's relied upon by the ALJ, which when viewed in isolation would seem to support the ALJ's decision. However, as noted above, despite the deference accorded the Commissioner's decision, the Court's review of the decision must take into account whatever in the record fairly detracts from it, see Reed, 399 F.3d at 920, and other statements of Ms. Schultz's suggest serious problems in these two domains. For example, she noted serious problems with completing work without careless mistakes, working without distracting himself or others, and finishing work on time; and very serious problems with completing class/homework assignments, playing cooperatively with other children, making and keeping friends, and respecting/obeying adults in authority.

Furthermore, the Court believes that the reliability of some of the statements the Commissioner now points to as supporting the ALJ's decision is suspect. For example, the comment on the second-quarter report card in January 2004 that Plaintiff was

17

"progressing nicely" appears at odds with the progress report less than two months later showing Ds in science and spelling, with two Fs on spelling tests. Similarly, the statement in Plaintiff's March 31, 2003 IEP that Plaintiff's strengths included good relationships with authority figures and being polite and well mannered is at sharp odds with the majority of the other contemporaneous school records, medical records, and Ms. Jones's testimony.

Although Plaintiff's IEP review of April 8, 2004, noted some improvement, it stated that Plaintiff continued to need special education service in areas related to the two domains in question. In sum, the Court does not believe that the ALJ's decision that Plaintiff did not have a marked impairment in attending and completing tasks and in interacting and relating to others is supported by substantial evidence in the record. Cf. Briggs v. Callahan, 139 F.3d 606, 608-09 (8th Cir. 1998) (finding denial of childhood benefits was supported by substantial evidence where child's hyperactivity improved with medication <u>and behavior was appropriate at school</u>) (emphasis added).

## **CONCLUSION**

The Court believes the decision of the Commissioner must be reversed and the case remanded to the Commissioner for further consideration of the record in light of the relevant statutory and regulatory provisions.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED,** and that the case be **REMANDED** to the Commissioner for further consideration.

The parties are advised they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 23rd day of January, 2006